SAMUEES, J.
The constitution of the United States, art. i, l 8, clause 16, declares, “The congress shall have power” “to exercise exclusive legislation in all cases whatsoever, over such district, (not exceeding ten miles square,) as may, by cession of particular states, and the acceptance of congress, become the seat of government of the United States.”
The state of Virginia, by the act of assembly passed December 3d, 1789, 13 Hen. St. p. 43-44, declared, “That a tract of country, not exceeding ten miles square, or any lesser quantity, to be located within the limits of this state, and in any part thereof as congress may by law direct, shall be and the same is hereby forever ceded and relinquished to the congress and government of the United States, in full and absolute right, and exclusive jurisdiction as well of soil as of persons, residing or to reside therein, pursuant to the tenor and effect of the eighth section of the first article of the constitution of the government of the United States.
2. Provided, that nothing herein contained shall be construed to vest in the United States any right of property in the soil, or to affect the rights of individuals therein, otherwise than the same shall or may be transferred by such individuals to the United States.
3. And provided also, that the jurisdiction of the laws of this commonwealth over the persons and property of individuals residing within the limits of the cession aforesaid, shall not cease or determine until congress, having accepted the said cession, shall by law provide for the government thereof, under their jurisdiction, in manner provided by the article of the constitution before recited.”
The state of Maryland having by statute provided for a cession of territory to the federal government, the acts of congress passed July 16, 1790, 1 U. S. Stat. at Large, p. 130, and March 3d, 1791, 1 U. S. Stat. at Large, 214, and the executive action under those acts, fully completed the cession, and parts of Virginia and Maryland made to form the District of Columbia, the seat of the federal government.
In discharge of the duty to provide laws for the government of the district thus established, it was enacted by congress February 27th, 1801, 2 U. S. Stat. at Earge, p. 103, ch. IS, | 1, “That the laws of the state of Virginia, as they now exist, shall be and continue in force in that part of the District of Columbia which was ceded by the said state to the United States, and by them accepted for the permanent seat of government. ’ ’
In further discharge of the duty to provide laws, it was enacted by congress June 24, 1812, 2 U. S. Stat. at Earge, p. 7S6, ch. 106, 'é 4, “that real estate in the county of Alexandria shall be subject to the payment of debts hereafter contracted in the same manner, to the same extent, and by the same process as real estate in the county of Washington is subject to the payment of debts by the laws now in force in the said county of Washington, the operation of., which laws is hereby extended to real estate in the said county of Alexandria for the satisfaction of debts hereafter contracted.” 2 U. S. Stat. at Earge, p. 756, ch. 106, 1 4.
*The county of Alexandria, in this act mentioned, included that part of the district of Columbia which was ceded by the state of Virginia, and the county of Washington that part which was ceded by the state of Maryland. The law governing the county of Washington is the same as the law of Maryland: And thus the liability of real estate in Alexandria to be applied in satisfaction of debts is regulated and controlled by law the same as that of Mar3'land.
It was conceded in the argument here, and is fully shown by numerous adjudged cases in the Court of appeals of Maryland, that the statute 5 George 2, ch. 7, \ 4, was in force in that state February 27th, 1801, when their laws were extended by act of congress to Washington county; and was in force in Washington county June 24th, 1812, when the law of that county was extended to Alexandria county.
The statute 5 Geo. 2, ch. 7, l 4, provides, “That from and after the twenty-ninth day of September one thousand seven hundred and thirty-two, the houses, lands, negroes, and other hereditaments and real estates situate or being within any of the said plantations, belonging to any person indebted, shall be liable to and chargeable with all just debts, duties and demands, of what nature or kind soever, owing bj' any such person to his majesty, or any of his subjects, and shall and may be assets for the satisfaction thereof in like manner as real estates are by the law of England liable to the satisfaction of the debts due by bond or other specialty, and shall be subject to the like remedies, proceedings and process in any court of law or equity in any of the said plantations respectively, for seizing, extending, selling or disposing of any such houses, lands, negroes and other hereditaments and real estates, towards the satisfaction of such debts, duties and demands, and in like manner as personal estates in any of the said plantations respectively are seized, extended, sold or disposed of for the satisfaction of debts.”
*The act of the general assembly passed February 3d, 1846, Sess. Acts, p. 50, the act of congress passed July 16th, 1846, and the act of assembly passed March 13th, 1847, Sess. Acts, p. 41, taken together, produced the effect of bringing the county of Alexandria again within the jurisdiction of this state, and making the territory a part of the state. They had the further effect of securing to all persons all rights acquired under the laws theretofore in force in that county, and of preserving all actions there pending; and of requiring the courts *492 of this state to respect all proceedings theretofore rightly had in such actions, and that all ulterior proceedings should be had according to the laws of Virginia.
The judgment was rendered in favor of Suckley, the surviving partner, against Libby in his lifetime, at April term 1820, for a debt contracted after June 24, 1812.
The act S Geo. 2, ch. 7, (j 4, according to its literal reading, as well as by the rules for construction of remedial statutes, subjected lobby’s whole estate to sale for satisfaction of Suckley’s debt, regarding it as a debt merely apart from its character as a judgment. The appellant’s intestate, the judgment creditor, having established his debt against Libby in his lifetime, was not compelled to look to the real estate as merely a secondary fund for payment, but had the right to look upon the estate, real and personal, as equally, liable. This right the creditor might exercise, unless some equitable reason should require him to proceed first against the personal estate. Hanson v. Barnes’ lessee, 3 Gill & Johns. 359; Gaither and Warfield v. Welch’s estate, Id. 259.
In the case before us the creditor filed a bill in chancery, alleging that the personal estate had been exhausted without paying his debt, and praying that the real estate might be subjected to the payment thereof. The executor and devisees being all parties, *the court directed an account of the personal estate in the hands of the executor, and in case of the real estate, held it liable for only so much of the debt as the personal estate would . not pay. The devisees have nothing to complain of, seeing that the creditor was thrown first upon the personal fund for payment. In the argument here, and in the answers of the defendants to the original bill, it was earnestly insisted that the creditor should seek satisfaction out of certain personal assets, that is, a debt due from Kee of Virginia, and another from Field of Kentucky, to Libby’s estate. The answer to this pretension is obvious; Libby’s executor had no authority to enforce the collection of these debts. There is, moreover, nothing to show that these debtors were solvent. On the contrary, certain facts in the record tend to show they were not so: An account of the personal estate was taken in which neither of these debts is mentioned, and no exception is taken for the omission. Moreover, there is no reason why the creditor should be required to give up a fund subject to a primary liability for his debt, and pursue another fund subject to the same liability. If any thing could have been realized from these debts of Kee and Field, it was the duty as well as the interest of the legatees and devisees to have looked after them.
In my opinion the appellant’s intestate was rightly in court praying the relief sought. His proceedings for maturing his case seem to have been had under the laws of Virginia in force February 27, 1801. I perceive no error therein, taking, as I do, the recitals in the decree as sufficiently showing that the case had been regularly proceeded in. If it should be conceded that a rule of the court did require the bill to be filed before the subpoena issued, still as the law directed otherwise, the law must prevail. Although the supreme court had authority to prescribe rules of ^practice in the circuit courts, those rules must be subordinate to the law. Although congress might have repealed or altered the law, yet it could not delegate that authority to another body.
After the decree at October term 1839 (made final as is said by the decree of May term 1840) had been rendered, Rotchford and wife and the heirs of Mrs. Thornton united in a bill praying an injunction to the further execution of the decree, and for a review and reversal thereof.
Regarding the decree of October term 1839 and the order of May term 1840 as one, yet according to the practice in Virginia, it should be held interlocutory only, and therefore not such as could be reversed upon bill of review. See 2 Rob. Pract. 414; Dunbar’s ex’ors v. Woodcock’s ex’or, 10 Leigh 628.
But according to the practice at that time prevailing in the District of Columbia, the decree would be held so far final as to be the subject of review by a bill for that purpose. Whiting v. The Bank of the U. S., 13 Peters’ R. 6; Ray v. Law, 3 Cranch’s R. 179.
Whatever may be the character of the decree complained of in the bill of review, and conceding for the present, that it was such as might be reversed on a bill of review showing sufficient cause for reversal, it yet remains to consider the sufficiency of the causes alleged in this bill, and how far they are sustained by proof. We are met at once by the obvious fact that some of these causes are personal and peculiar to Rotchford alone, or to Rotchford and wife, and others of them to Mrs. Thornton’s heirs. The only cause common to all the plaintiffs in the bill of review is the alleged want of jurisdiction to entertain the bill of complaint. In support of this objection, it is said that the'judgment should have been revived at law against the devisees, and the land thus subjected to the satisfaction of complainant’s judgment. In reply to this, it may *be said, that the creditor might have thus revived his judgment: and so, he might have revived it against the executor. But in either case, it would have been material to ascertain the amount due on the judgment, and possibly different results might have been arrived at in two several trials. In pursuing the fund in the hands of the executor it might have been necessary to convict him of a devastavit, by settling his account with the estate in his hands.
This objection to the jurisdiction, when properly analyzed, will be found to rest upon the ground that the creditor should have tried the same fact, that is, the amount of his debt, in two several suits; one with the *493 executor, the other with the devisees: or, that the creditor, to avoid two suits, migilt forego his claim on one or the other of the funds; that if he pursued the personal fund, he must encounter a second suit at law or in chancery, to subject the executor for a devastavit: that the devisees and legatees being the same persons, have the right to insist on having the creditor put to two suits; one against the executor, a trustee for the legatees; the other against the devisees directly: and all this for the purpose of obtaining payment of a debt, out of real and personal estate substantially belonging to the same persons as devisees or legatees.
The general principles of equity clearly justify the creditor in convening in one suit all parties interested in controverting the amount of his debt, and holding in their own hands or in the hands of their trustee the estate on which the debt is chargeable. The practice under the stat. 5 Geo. 2, ch. 7, $ 4, is to convene all parties in interest, so that any party may defend his own interest without .relying upon another for that purpose.
On the whole, I am of opinion the case was one peculiarly suitable for the cognizance of a court of equity.
*The objection that Thornton and wife were dead at the date of the decrees of October term 1839, and May term 1840, is not sustained by proof. Moreover they were proceeded against as absent defendants ; and the statute prescribes a different mode in which they or their heirs shall make defense.
The fact alleged that Eotchford had become the purchaser of the real estate or a portion of it, at a sale for the payment of taxes due the corporation of Alexandria, cannot sustain the bill of review, because his purchase, even if valid, was made before the decree of October 1839, and should have been relied on as a defense against the relief prayed in the original bill.
The causes for reversal alleged in the bill of review I regard as wholly insufficient for that purpose; and the Circuit court erred in permitting it to be filed. The subsequent proceedings in the cause having been had to some extent in consequence of the bill thus improperly filed, are necessarily also erroneous.
I am of opinion to reverse the decrees of the court below subsequent to that of May term 1840, in the manner and to the extent set forth in the decree of this court.
The other judges concurred in the opinion of Samuels, J.
The decree was as follows:
The court is of opinion that the said decree of the Circuit court rendered February 10th, 1852, is erroneous; that so much of the decree of November 28th, 1844, as annuls and sets aside the decree of May term 1840, which last mentioned decree makes final the decree of October term 1839; and so much thereof as gives leave to file an amended bill is also erroneous, such amended bill not being necessary in the position in which the case should be made to stand.
*The co’urt is further of opinion that there is no error in so much of the decree of November 28th, 1844, as approves and confirms the sales made under the decrees of October 1839 and May 1840. Therefore, it is decreed and ordered that such and so much of the several decrees hereinbefore declared to be erroneous be reversed and annulled; and that such part of the decree of November 1844 as is declared to be free of error be affirmed; and that the appellees do pay to the appellant his costs by him expended in the prosecution of his appeal aforesaid here.
And this court, proceeding to pronounce such decree as the Circuit court should have pronounced, it is further decreed and ordered, that the decrees of October term 1839 and May term 1840 be reinstated in their original force and effect; that the injunction awarded upon the filing of the bill of review be dissolved, and the bill of review dismissed; that the amended bill filed by complainant at September rules 1845 be also dismissed as being unnecessary, and that the appellees do pay unto the appellant his costs in the Circuit court expended in defending himself against the bill of review and in filing his amended bill.
It is further ordered, that the bill of re-vivor (erroneously called a bill of review) filed July rules 1851, to revive in the name of Suckley’s administrator, be dismissed, the suit having been so revived at June term 1851. And the cause is remanded, with directions to revive the suit, if revivor be necessary, and for further proceedings to enforce the rights of the appellant accrued under the laws heretofore governing the county of Alexandria, but according to the practice prescribed by the laws of this state now in force in that county.